IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                      CRIMINAL ACTION NO. 2:11-cr-00191

RANDALL JUSTIN MCGEE,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Randall Justin McGee's Motion to Suppress [Docket 25]. The United States responded to the motion on October 11, 2011. On October 14, 2011, the Court held a hearing and heard argument regarding three pretrial motions, including the suppression motion. For the reasons set forth below, the motion to suppress is **DENIED**.

*I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

The facts known to the Court are derived from the parties' briefing on the motion to suppress and live testimony from the pretrial motions hearing, which consists of the testimony of three law enforcement officers: Patrolman O.B. Morris, Detective David Richardson, and Officer J.K. Halstead. Those facts are as follows.

On July 26, 2011, Officer J.K. Halstead of the South Charleston Police Department spotted a Dodge Avenger moving south on U.S. 77 near mile marker 99, which is near downtown Charleston, West Virginia. Officer Halstead observed that the vehicle's center brake light was non-operational, and he initiated a traffic stop for an equipment violation around 12:34 in the

afternoon.  At the time of the traffic stop, Officer Halstead was assigned to the Metropolitan Drug Enforcement Network Team (MDENT), a multi-jurisdictional task force focused on drug interdiction in southern West Virginia.

Upon approaching the vehicle, Officer Halstead requested the driver's license and the vehicle registration.  The driver, Kardell Moore, was able to produce a Michigan driver's license.  Officer Halstead asked Moore to exit the Avenger and accompany him to the front of Halstead's patrol car, so that Officer Halstead could explain the basis for the traffic stop to Moore.  At that time, Moore volunteered to Officer Halstead that he believed his driver's license to be suspended due to unpaid citations in Michigan.  Moore also provided Officer Halstead with a rental agreement for the vehicle.  Officer Halstead observed that the rental agreement was one week overdue—the car was to have been returned to the lessor, Enterprise Rent-A-Car, on July 19, 2011—and that the agreement was in the name of a third party who was not present.[1]  Officer Halstead proceeded to ask about the destination and reason for Moore's trip.  Moore responded that he and his passenger were traveling to Charlotte, North Carolina, to visit a sick family member.  Moore stated that they would be staying in Charlotte for one day and then driving back to Detroit, Michigan, their point of origination.  Moore reported that he and his passenger departed from Detroit at 6:00 a.m. that day.

Next, Officer Halstead explained to Moore that he was going to speak with the vehicle's passenger to ascertain whether the passenger was able to legally drive the vehicle away from the stop if Moore's license was indeed suspended.  Officer Halstead presumably instructed Moore to remain at or near the front of the patrol car.  Officer Halstead testified that when he approached the

---

[1] No additional information regarding the rental contract, such as the lessee's name or rental location, is in the record.

passenger, who was still seated in the vehicle, he asked for the passenger's name. Officer Halstead immediately noticed that the passenger, Defendant Randall McGee, was speaking in a low tone of voice and his hands were visibly shaking. In response to Officer Halstead's question, McGee identified himself as "Randell McGee"[2] and specified his date of birth. Officer Halstead also testified that McGee had trouble spelling his name when he gave it.[3] Officer Halstead then proceeded to ask McGee about his destination, to which McGee initially replied that the pair was coming to Charleston. Officer Halstead testified that McGee then "quickly changed his story to Charlotte, North Carolina." (Docket 25 at 2; Docket 38 at 2-3.) McGee elaborated that the pair was traveling to Charlotte to see no one in particular and that they planned to stay in Charlotte for four days.

After speaking with Moore and McGee individually, Officer Halstead returned to his patrol car. Officer Halstead then called Detective David Richardson, Officer Halstead's MDENT supervisor, to request assistance with the stop. When Detective Richardson did not answer his cell phone, Officer Halstead called Patrolman O.B. Morris, who works in the Charleston Police Department, for the same purpose. Detective Richardson immediately called Officer Halstead back, and Halstead requested Richardson to "run by" the stop. At that point, Officer Halstead proceeded to inquire with Kanawha County Metro Communications about the status of Moore's driver's license. Ultimately, Metro Communications confirmed that Moore's license was suspended. Officer Halstead also provided Metro Communications with the name and date of birth McGee provided,

---

[2] Officer Halstead asked McGee to spell his name, and this is the given spelling.

[3] At the suppression hearing, Officer Halstead stated that McGee had difficult spelling his name and "had to think about it a little bit."

3

but Metro Communications was "unable to find any matching records through the State of Michigan." (Docket 25 at 3; Docket 38 at 3.)

As Officer Halstead was running Moore's license and McGee's information through Metro Communications, Patrolman O.B. Morris and Detective Richardson arrived.[4] Police records indicate that the time of Patrolman Morris's arrival was approximately 12:46 p.m. Upon arriving, Morris began talking with Moore, the driver. Shortly thereafter, at approximately 12:48 p.m.,[5] Detective David Richardson also arrived at the stop. Detective Richardson approached Officer Halstead, who was seated in his patrol car, presumably communicating with Metro Communications. Halstead informed Detective Richardson that the stop was initiated for a brake light malfunction, that the driver had indicated his license may be suspended, and that Halstead was communicating with Metro Communications to verify the status of the driver's license.[6] Officer Halstead further informed Detective Richardson that he had observed some suspicious behavior from the passenger, specifically: (1) Halstead believed McGee provided an incorrect spelling of his name; (2) in any case, McGee had trouble spelling his name when asked; (3) McGee's hands were visibly shaking; and (4) McGee spoke in a very low tone of voice. With Officer Halstead's agreement, Detective

---

[4] Officer Halstead's testimony was that "as [he] was doing that [communicating with Metro Communications], they [Morris and Richardson] were arriving." Officer Halstead also replied in the affirmative to defense counsel's inquiry "So you finished with Metro as they [Morris and Richardson] were arriving?"

[5] Officer Halstead testified that only "a minute or two" passed between Patrolman Morris's arrival and Detective Richardson's arrival.

[6] Detective Richardson testified that when he approached Officer Halstead, who was seated in his patrol car, Halstead "advised that the driver had stated that he . . . believed he was suspended and that was what he [Halstead] was checking and he [Halstead] advised that he had spoken to the passenger of the vehicle and believed that the passenger was acting extremely nervous, just more nervous than he should be for a routine traffic stop."

Richardson approached the passenger side of the vehicle, leaned over to the window, and asked McGee how he was doing. According to Detective Richardson's testimony, McGee made no response, ignored Richardson, and remained completely still and rigid with his hands firmly planted on his lap and his eyes fixed straight ahead. In response, Detective Richardson leaned further into the car to attempt eye contact with McGee and asked McGee what his name was. McGee replied "Justin" without making eye contact. Because Officer Halstead had informed Detective Richardson that the passenger's name was "Randell McGee," Richardson asked McGee for his name again. This time, McGee replied "Randall."[7] Detective Richardson reiterated the question two more times, to which McGee replied "Justin Randall" and "Randall Justin McGee," respectively. During this exchange, Detective Richardson also noticed that McGee's pulse was visible on his neck, his breathing was labored, his lips were sticking together, and saliva was visibly sticking to McGee's lips. Based on these observations and his inability to clearly hear McGee,[8] Detective Richardson asked McGee to exit the vehicle. At the suppression hearing, Detective Richardson estimated that thirty to forty seconds had passed from the time he initially approached McGee until he asked McGee to step out of the car.

As McGee exited, Detective Richardson "asked him if he had anything on his person that I [Richardson] needed to know about and asked him if I [Richardson] could search him." Detective Richardson testified that McGee stated he had nothing on his person and that Richardson could

---

[7] There is no indication that Detective Richardson asked McGee to spell his name, so it is inconsequential whether the name was "Randall" or "Randell" when spoken to Richardson. The Court uses "Randall" simply because it appears to be McGee's true first name.

[8] Detective Richardson testified that he has trouble hearing out of his left ear, and that his impairment, coupled with the noise created by mid-day traffic, was the reason he asked McGee to exit the vehicle.

5

search him. Based on that consent, Detective Richardson instructed McGee to face the Avenger with his hands on the roof. A pat down of McGee yielded what Detective Richardson believed felt like a bag of pills secured in McGee's crotch. As Detective Richardson was searching McGee's crotch area, McGee's knees "kind of went weak" and "[h]is shoulders kind of collapsed like the air went out of him." At that point, Detective Richardson placed McGee in hand restraints and requested gloves from Officer Halstead to retrieve the bag from McGee's crotch. Detective Richardson's search resulted in the retrieval of 151 Oxymorphone or Opana pills and 246 30-mg Oxycodone pills. Both occupants were placed under arrest (Moore for driving on a suspended license and McGee for possessing suspected narcotics) and seated in separate patrol vehicles. The officers conducted a complete search of the vehicle, which produced nothing of significance, and waited for a tow truck to arrive on the scene. They departed the scene around 1:10 p.m.

An indictment was returned against McGee on August 23, 2011, charging him with possessing with intent to distribute Schedule II controlled substances in violation of 21 U.S.C. § 841(a)(1).

## II. DISCUSSION

*A. Applicable Law*

The Fourth Amendment of the U.S. Constitution protects individuals "against unreasonable searches and seizures." U.S. Const. amend IV. The Supreme Court of the United States has recognized that "[t]emporary detention of individuals during the stop of an automobile by the police . . . constitutes a 'seizure,' . . . within the meaning of the [Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809 (1996). During a traffic stop, a police officer "seizes everyone in the vehicle, not just the driver." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (citing *Delaware v.*

*Prouse*, 440 U.S. 648, 653 (1979)). It is therefore well-settled that "[a]n automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (quoting *Whren*, 517 U.S. at 810).

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335 (citing *Illinois v. Cabelles*, 543 U.S. 405, 407 (2005)). The Supreme Court has held that police questioning that does not prolong a seizure does not provide a legitimate basis for a Fourth Amendment claim. *Cabelles*, 543 U.S. at 407. Thus, pursuant to such a stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). Our court of appeals has now established that when a lawful traffic stop is initiated, "an officer . . . to gain his bearings and . . . acquire a fair understanding of the surrounding scene . . . may request identification of . . . [vehicle] passengers" as well as drivers. *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) ("We believe a simple request for identification from passengers falls within the purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event."). Additionally, an officer making a traffic stop may order the driver as well as any passengers to get out of the car pending completion of the stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (driver); *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) (passenger); *Soriano-Jarquin*, 492 F.3d at 500 ("[A]n officer may 'as a matter of course' and in the interest of personal safety order a passenger to physically exit the vehicle.") (quoting *Wilson*, 519 U.S. at 410). Finally, an officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into

something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration. *See Muehler v. Mena*, 544 U.S. 93, 100-01 (2005).

> Regarding the permissible duration of a traffic stop, the Fourth Circuit noted in *Branch*:
>
> The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). Thus, once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver "must be allowed to proceed on his way." *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992). Of course, if the driver obstructs the police officer's efforts in any way—for example, by providing inaccurate information—a longer traffic stop would not be unreasonable. *See United States v. Sharpe*, 470 U.S. 675, 687–88 (1985).

*Id.* at 336; *see also United States v. DiGiovanni*, 650 F.3d 498, 511 (4th Cir. 2011) (citing out-of-state licenses and the provision of incorrect information as factors supporting the reasonableness of a longer stop). Thus, a stop is constitutionally permissible provided its scope and duration do not exceed what is reasonable under the circumstances, which includes whether the vehicle's occupants are cooperative or obstructive to the officer in his pursuit of the stop's original purpose.

If the seizure is extended beyond the scope of a routine traffic stop—whether incident-free or somehow obstructed by an occupant of the vehicle—the police officer must "possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336 (citing *Royer*, 460 U.S. at 500). Thus, a stop prolonged beyond what is reasonable to accomplish the goals of the original stop requires consent or "reasonable suspicion" that criminal activity is afoot. *Id.* In order to demonstrate reasonable suspicion, a police officer must offer "specific and articulable facts" that demonstrate at least "a minimal level of objective justification" for the belief that criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). A court is to look to the totality of the circumstances in determining whether an officer

had a particularized and objective basis for suspecting criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Something more than an "inchoate and unparticularized suspicion or hunch" is required, but the officer's suspicions need not rise to the level of probable cause. *See United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997).

*B. Analysis*

McGee first challenges the legitimacy of the original traffic stop by questioning the veracity of Officer Halstead's testimony that the Dodge Avenger had a defective center brake light. (Docket 25 at 6-7.) "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. There was no evidence offered to refute Officer Halstead's testimony that the vehicle's center brake light was defective, nor was legal argument presented on whether such a defect indeed constitutes a traffic violation. In West Virginia, as in many other states, it is illegal for a vehicle to feature non-operational brake lights, regardless of the number of such lights. *See* W. Va. Code § 17C-15-18(b) ("When a vehicle is equipped with a stop lamp or other signal lamps, such lamp or lamps shall at all times be maintained in good working condition."); *see also United States v. Young*, 75 F. App'x 118, 120 (4th Cir. 2003) (unpublished opinion) (applying § 17C-15-18(b) to a vehicle with one operational and one non-operational brake light, and holding a traffic stop on this basis adequately supported by probable cause). Officer Halstead's testimony was entirely credible. On the record before the Court, Officer Halstead had probable cause to believe that the driver of the Dodge Avenger had committed a traffic violation, and the stop was therefore constitutionally sound.

Next, McGee argues that the stop was impermissibly "extended so [Detective] Richardson could further investigate the vehicle passenger, Mr. McGee." (Docket 25 at 7.) At the risk of

making McGee's arguments for him, the Court interprets this challenge to be of two dimensions. First, McGee appears to argue that the duration of his seizure exceeded a constitutionally reasonable time period for the officers to perform the traditional incidents of a traffic stop, considering its specific purpose—here, a defective brake light. Second, assuming that the stop exceeded a constitutionally reasonable duration to fulfill its original purpose, the officers did not have any independent reasonable, articulable suspicion to further detain McGee under *Terry v. Ohio*.

There is no indication that the duration of this traffic stop exceeded a reasonable period of time to execute the original purpose of the stop and handle complications that arose during the course of the stop. The facts in this case indicate that much, if not all, of McGee's fifteen-minute detention was justified by "ordinary inquiries incident to" a routine traffic stop. *See Cabelles*, 543 U.S. at 408. After observing the vehicle's defective brake light, Officer Halstead was clearly entitled to detain not only the driver of the vehicle, but also McGee—a passenger—for a reasonable duration to verify that the driver was entitled to operate his vehicle and to issue an appropriate warning or citation for the offense. *See Foreman*, 369 F.3d at 781; *Rusher*, 966 F.2d at 876. Binding constitutional jurisprudence additionally permits that, in the course of interacting with the vehicle's occupants and to ensure the officer's safety, an officer may request identification from all vehicle occupants and even order the occupants to exit the vehicle as part of the original seizure. *See Soriano-Jarquin*, 492 F.3d at 500 (identification); *Mimms*, 434 U.S. at 110 (driver exit); *Wilson*, 519 U.S. at 414-15 (passenger exit). Here, Officer Halstead testified that he made contact with the driver and asked the driver to accompany him to the front of his patrol car to discuss the reason for the stop. At this time, the driver volunteered information that a separate traffic offense—driving on a suspended license—may have transpired. The driver also supplied Officer Halstead with a rental

agreement for the car, which was one week overdue and in the name of a non-occupant third party. This information alerted Officer Halstead to the possibility that the vehicle would need to be driven from the scene by someone else, presumably either the passenger or a law enforcement officer, to impound it.

At that point, Officer Halstead approached McGee in the passenger's seat of the vehicle to inquire about his identity and the possibility of his driving the car from the scene.[9] After acquiring McGee's name and birth date, Officer Halstead returned to his patrol car to request backup and verify the occupants' information. Each of Officer Halstead's actions up to this point fall squarely within the scope and duration of the initial traffic stop. This conclusion is borne out by the fact that Patrolman O.B. Morris, one of the two responders to Officer Halstead's request for backup, arrived on the scene at 12:46 p.m., a mere twelve minutes after the stop was initiated.[10] Furthermore, only the phone calls to Patrolman Morris and Detective Richardson arguably fall outside the scope of the original stop. Any prolongation of the stop caused by the backup calls can be attributed to the driver's admission that his license was suspended and McGee's inability to produce a valid driver's

---

[9] Officer Halstead also asked McGee about his destination and the anticipated duration of his stay. At the hearing, defense counsel made the point that a passenger's destination is inconsequential to a stop for a defective brake light. However, there is no indication that the additional question meaningfully prolonged the seizure. *See United States v. Mason*, 628 F.3d 123, 132 (4th Cir. 2010) ("The one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern.") (citing *United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008) (holding that de minimis delays in conducting a traffic stop do not violate the Fourth Amendment). In addition, an officer is permitted to "gain his bearings and . . . acquire a fair understanding of the surrounding scene" in connection with a traffic stop, which includes assessing his safety through simple inquiries of vehicle occupants. *Cf. Soriano-Jarquin*, 492 F.3d at 500 ("[A]n officer . . . to gain his bearings and . . . acquire a fair understanding of the surrounding scene . . . may request identification of . . . [vehicle] passengers.").

[10] These twelve minutes include speaking with each vehicle occupant individually, calling Morris, and transport time.

license in his possession. In plain terms, Officer Halstead reasonably believed that several officers may be required to drive the vehicle from the highway and separately escort the occupants from the scene.[11] Any extension in the duration of the stop to place backup calls was de minimis and necessitated by the circumstances presented by the vehicle occupants.

After placing the backup calls, Officer Halstead proceeded to communicate with dispatch regarding the vehicle driver's license and the identification information furnished by McGee. As stated, Patrolman O.B. Morris arrived on the scene at 12:46 p.m. and proceeded to converse with the driver, who was seated on a guardrail between the Dodge Avenger and Officer Halstead's patrol car. According to Officer Halstead, Detective Richardson arrived one or two minutes after Patrolman Morris, which would place his arrival at approximately 12:48, fourteen minutes after the stop was initiated. Officer Halstead stated that as he was still verifying the occupants' information with dispatch, officers Morris and Richardson were arriving.[12] Upon Detective Richardson's arrival, he approached Officer Halstead, who was still seated in his patrol car. After their exchange, Detective Richardson approached McGee and initiated contact. At the same time Detective Richardson engaged McGee, Officer Halstead re-approached the driver to explain that he would be issuing a warning citation for the defective brake light and that the driver's license was indeed

---

[11] If Officer Halstead had placed backup calls after even one of the occupants had presented a facially valid driver's license, as well as a valid rental agreement or vehicle registration, the Court would be faced with a far more difficult issue. However, those facts are not before the Court, and the backup calls in this case fall within the course of the traffic stop.

[12] To avoid confusion, the Court acknowledges again that in response to defense counsel's questioning, Officer Halstead responded that he was finished or finishing with dispatch as the other two officers were arriving. From the entirety of Officer Halstead's and Detective Richardson's testimony, the Court discerns that Officer Halstead was nearing or at the end of his verification efforts with Metro Communications in the minutes that comprise the arrival of Patrolman Morris and Detective Richardson, approximately 12:46 p.m. to 12:48 p.m.

suspended. Officer Halstead testified that *while he was engaged with the driver*, he observed McGee exit the vehicle, Detective Richardson speak with him briefly, and then Richardson engage in a pat-down of McGee. The fact that Halstead was still engaged with the driver, explaining the ultimate outcome of the stop with him, the entire time Richardson was questioning McGee is significant. Police questioning that does not prolong a seizure does not provide a legitimate basis for a Fourth Amendment claim. *Cabelles*, 543 U.S. at 407. There is no indication that Detective Richardson's interaction with McGee prolonged the duration of the stop, and, in fact, the officers' testimony indicates that Officer Halstead was still concluding his original traffic stop with the driver when he observed the pat-down of McGee.

In summary, there is nothing in the record to indicate that the traffic stop was prolonged prior to the arrival of Patrolman Morris and Detective Richardson. Officer Halstead's actions fully comport with the Fourth Amendment. Detective Richardson testified that from the time he arrived at the scene, which was approximately fourteen minutes after the stop was initiated, until he asked McGee to exit the vehicle, only thirty to forty seconds elapsed. The total time from the initial seizure until Detective Richardson felt what he believed to be a large bag of pills in McGee's crotch was therefore approximately fifteen minutes.[13] Officer Halstead testified that he was still engaged with the driver, endeavoring to conclude the initial traffic stop, when he observed Detective Richardson conducting the pat down. The inescapable conclusion from the above facts and precedents is that the duration of the traffic stop did not exceed what was reasonable under the

---

[13] At one point in the suppression hearing, Officer Halstead stated that "the full thing" lasted approximately thirty minutes, but that answer was given in response to the government's question of approximately how long elapsed between the initiation of the stop and Officer Halstead's departure from the scene.

13

circumstances to accomplish the objectives of the initial stop. *See Sharpe*, 470 U.S. at 687–88 ("We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains.").

Having arrived at this conclusion, the Court need not address McGee's argument that the officers possessed no independent reasonable, articulable suspicion to prolong the stop or initiate a pat-down. The scope and duration of the stop were reasonable, and the officers needed no additional justification to request identification from McGee or ask him to exit the vehicle.[14]

The Court therefore addresses McGee's final point of contention: that he did not give consent for Detective Richardson to search his person. (Docket 25 at 8.) Detective Richardson's testimony that McGee consented to be searched is not challenged by any evidence. "The question [of] whether . . . consent . . . was voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances . . . and is a matter which the Government has the burden of proving." *United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 227 (1973)). In this case, there were no threats, and there was no show of force. McGee was asked whether he would consent to be searched, and he did so consent. While defense counsel suggested that the presence of three officers on the scene may have been coercive, McGee was directly faced with only Richardson when he consented to be searched. The stop occurred in broad daylight and in plain view of passing traffic. The totality of

---

[14] The Court notes in passing, however, that a long-overdue rental policy in another individual's name is reason enough to detain a vehicle long enough for officers to verify that the vehicle has not been reported stolen. There is no indication that the officers in this case endeavored to do so, but they would have been well within constitutional bounds to run the vehicle identification number through dispatch as well.

the evidence in this case is plainly adequate to support a finding that McGee voluntarily consented to the search.

### *III.  CONCLUSION*

For the foregoing reasons, the Motion to Suppress [Docket 25] is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:    October 27, 2011

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE